JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

**APPENDIX H**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Brady Enterprises, et al on behalf of themselves all other similarly situated

(b) County of Residence of First Listed Plaintiff Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Medco Health Solutions, Inc. and Merck & Co., Inc.

County of Residence of First Listed Bergen County, NJ
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
H. Laddie Montague, Jerome M. Marcus, Berger & Montague, P.C., 1622 Locust St., Phila., PA 19102 and as listed in complaint

Attorneys (If Known)

2003 AUG 15 PM 5:22 EDPA CLERK

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury—Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C.§1 Complaint charges joint action by defendants and others to restrain trade on the sale of pharmaceuticals.

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $**

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE 8/15/2003 SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

APPENDIX N

## SUMMONS IN A CIVIL ACTION

| UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA | |
|---|---|
| Brady Enterprises, Inc., et al on behalf of themselves and all others similarly situated<br>v.<br><br>Medco Health Solutions, Inc. and Merck & Co., Inc. | CIVIL ACTION NO.<br><br>TO: (NAME AND ADDRESS OF DEFENDANT)<br><br>Merck & Co., Inc.<br>One Merck Drive<br>Whitehouse Station, NJ 08889 |

**YOU ARE HEREBY SUMMONED** and required to serve upon

Plaintiff's Attorney (Name and Address)

H. Laddie Montague, Esq.
Jerome M. Marcus, Esq.
Berger & Montague, P.C.
1622 Locust St.
Philadelphia, PA 19103

an answer to the complaint which is herewith served upon you, within days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

| Michael E. Kunz, Clerk of Court | Date: |
|---|---|
| (By) Deputy Clerk | |

**APPENDIX N**

**SUMMONS IN A CIVIL ACTION**

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Brady Enterprises, Inc., et al on behalf of themselves and all others similarly situated<br>v.<br><br>Medco Health Solutions, Inc. and Merck & Co., Inc. | CIVIL ACTION NO.<br><br>TO: (NAME AND ADDRESS OF DEFENDANT)<br>Medco Health Solutions, Inc.<br>100 Parsons Pond Drive<br>Franklin Lakes, NJ 07417 |

**YOU ARE HEREBY SUMMONED** and required to serve upon

Plaintiff's Attorney (Name and Address)

H. Laddie Montague, Esq.
Jerome M. Marcus, Esq.
Berger & Montague, P.C.
1622 Locust St.
Philadelphia, PA 19103

an answer to the complaint which is herewith served upon you, within days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

| | |
|---|---|
| Michael E. Kunz, Clerk of Court | Date: |

(By) Deputy Clerk

**APPENDIX I**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Brady Enterprises, et al, on behalf of themselves and all others similarly situated | : | CIVIL ACTION |
| v. | : | |
| Medco Health Solutions, Inc. and Merck & Co., Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( X)

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

| | | |
|---|---|---|
| 8/15/2003 | Jerome M. Marcus | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-875-3000 | 215-875-4606 | jmarcus@bm.net |
| **Telephone** | **FAX Number** | **E-Mail Address** |

# UNITED STATES DISTRICT COURT

APPENDIX F

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: P.O. Box 890099, Weymouth, MA 02189

Address of Defendant: Medco - 100 Parsons Pond Dr., Franklin Lakes, NJ 07417

Place of Accident, Incident or Transaction: ______

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a)) Yes ☒ No ☐

Does this case involve multidistrict litigation possibilities? Yes ☐ No ☒

RELATED CASE, IF ANY:

Case Number: ______ Judge ______ Date Terminated: ______

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☒
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☐ No ☒
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court? Yes ☐ No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. Federal Question Cases:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases (Please specify)

B. Diversity Jurisdiction Cases:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases (Please specify)

## ARBITRATION CERTIFICATION

(Check appropriate Category)

I, Jerome M. Marcus, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 8/15/2003 [signature] Attorney-at-Law PA Atty ID 50708 Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

DATE: ______ [signature] Attorney-at-Law ______ Attorney I.D.#

CIV. 609 (4/03)

## UNITED STATES DISTRICT COURT

**APPENDIX F**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: P.O. Box 890099, Weymouth, MA 02189

Address of Defendant: Medco - 100 Parsons Pond Dr., Franklin Lakes, NJ 07417

Place of Accident, Incident or Transaction: ____________________

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a)) Yes ☒ No ☐

Does this case involve multidistrict litigation possibilities? Yes ☐ No ☒

Case Number: ____________ Judge ____________ Date Terminated: ____________

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☒
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☐ No ☒
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court? Yes ☐ No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. [illegible]

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify)

B. [illegible]

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify)

## ARBITRATION CERTIFICATION

[illegible]

I, Jerome M. Marcus, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 8/15/2003 ____________ Attorney-at-Law PA Atty ID 50708 Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

DATE: ____________ ____________ Attorney-at-Law ____________ Attorney I.D.#

CIV. 609 (4/03)

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRADY ENTERPRISES, INC., CHARLOTTE J. LOPACKI, d/b/a BUDGET DRUG and HERITAGE PHARMACY, INC., on behalf of themselves and all others similarly situated, and the PHARMACY FREEDOM FUND and the NATIONAL COMMUNITY PHARMACISTS ASSOCIATION, | ) | Civ No. 03 - 4730 (Dubois) |
| Plaintiffs, | ) | Class Action Complaint |
| v. | ) | Jury Trial Demanded |
| MEDCO HEALTH SOLUTIONS, INC., and MERCK & CO., INC., | ) | |
| Defendants. | ) | |

Plaintiffs Brady Enterprises, Inc., Charlotte J. Lopacki d/b/a Budget Drug and Heritage Pharmacy, Inc., by their attorneys, bring this action on behalf of themselves and all others similarly situated, along with Plaintiffs Pharmacy Freedom Fund and National Community Pharmacists Association. On information and belief, Plaintiffs allege as follows:

**NATURE OF ACTION**

**A. Introduction**

1. Medco Health Solutions, Inc. ("Medco"), the largest Prescription Benefit Manager ("PBM") in terms of net revenue and drug expenditures, has used the power it wields as a common agent of many large insurance companies, managed health organizations, governmental and private employers, and unions to engage in illegal anticompetitive activities designed to increase Medco's own revenues and profits at the expense of community retail pharmacies across the nation, and often against the interests of the almost 65 million Americans

covered by prescription benefit plans that Medco administers.

2. By its abuse of power, Medco perverted the concept of prescription benefit management. Instead of attacking the real causes of escalating prescription drug costs, it concentrates its efforts on extracting more money from retail pharmacies and diverting business from them. Retail pharmacy is a highly competitive industry that offers one of the greatest bargains in healthcare. The average fee that PBMs paid community retail pharmacies for dispensing a prescription for a brand name drug in 2001 was a mere $2.21 compared to $2.50 in 1995, a decline of 11.6% in nominal terms and 24% when adjusted for inflation. In that time period, PBM reimbursement rates to retail pharmacies for the drugs they dispensed also declined. While the rebates that PBMs receive from brand name drug makers are highly publicized, the fact is that all of the savings that PBMs obtain on generic drugs and the substantial majority of the overall savings that they obtain on brand name drugs come from retail pharmacy discounts, not from drug manufacturer discounts or rebates. Medco has reported, for example, that the total rebates earned from drug manufacturers (including Merck & Co., its parent) during calendar year 2002 was $2.465 billion or roughly 7.5% of its total drug spend, and had declined from 2001. In contrast, the discounts it receives from retail network pharmacies are more than 15% of its drug spend for brand name drugs and more than 25% of its drug spend for generic drugs. And, Medco is forcing pharmacies to increase discounts every year.

3. Employers are facing increases in prescription drug costs for their employees averaging 14% to 17% a year owing, in large part, to the rising prices of brand name prescription drugs and the introduction and aggressive marketing of more expensive drugs by brand name drug manufacturers including Merck & Co., Inc. ("Merck"). The 2002 financials for the operations of Merck other than Medco reveal where the lion's share of the money spent on brand

name prescription drugs goes. Merck's non-Medco operations (mainly, its sales of brand name drugs) had total sales of $21.45 billion in 2002. Its income before taxes on those sales was $9.65 billion – 45% of sales – after taking out $2.7 billion for R&D (13% of sales) and $5.65 billion (26% of sales) for marketing. Even that understates Merck's earnings as a percentage of sales for drugs Merck sold in the U.S. because its profit as a percentage of sales is much higher in the U.S. than in most other countries.

4. Rather than functioning as an impartial prescription benefit manager, Medco has in fact functioned as Merck's alter ego. Medco has promoted the use of Merck's brand name drugs so that, as Medco admits, Merck's products have and, for years have had, a significantly higher market share in the plans that Medco administers than in other third-party plans although Merck pays Medco disproportionately lower rebates than other brand name manufacturers. Even though Merck will be spinning Medco off to Merck's shareholders in 2003, Medco will hardly be independent. The stranglehold that Merck has on Medco's core PBM business is evident from the five-year Managed Care Agreement that Merck required Medco to sign in July 2002. That Agreement requires that, for at least the next four years, Medco place Merck patented products in preferred positions in all formularies and give Merck preferred access to Medco clients. It also provides for liquidated damages of 50% of lost revenues if the sales and/or market shares of Merck products in Medco-administered plans fail to achieve certain thresholds. If Medco fails to promote Merck's patented products, the liquidated damages could render Medco insolvent.

5. Most experts agree that promoting greater use of generic drugs in place of brand name drugs and having a patient try lower-cost medications before using the more expensive ones are the most effective ways to contain the increasing cost of prescription drugs that

employers are experiencing. Medco claims it does both. Yet, its actions demonstrate the opposite. Medco has been steadily reducing the amount it pays retail pharmacies, especially for generic drugs, in order to generate greater profits for itself. In doing so, it actually penalizes the retail pharmacies that vigorously promote the greater use of generic drugs that would save employers much more money. Indeed, Medco is paid significant sums by major pharmaceutical companies to promote expensive brand-name drugs, thereby encouraging greater use of expensive brand name drugs.

## B. Medco Is the Common Agent for Plan Sponsors

6. Medco is a Prescription Benefit Manager. On behalf of Plan Sponsors, Medco contracts for the purchase of brand name and generic prescription drugs and dispensing services from retail pharmacies; manages networks of retail pharmacies; and handles the processing, adjudication (determination of the claim validity and amount), and payment of claims made by retail pharmacies for prescriptions they fill for members of prescription benefit plans that Medco administers ("Plan Members").

7. "Plan Sponsors" are entities that contract with and pay PBMs to administer prescription drug benefit programs. While some large employers contract directly with Medco for programs covering their employees, most employers whose employees are included in a PBM plan administered by Medco obtain the PBM benefits through an insurance company, Blue Cross Blue Shield plan, or managed care company. Such companies account for a substantial majority of the persons in PBM Plans administered by Medco and include many of the leading insurance, Blue Cross Blue Shield, and managed care companies in the U.S.

8. In its role as plan administrator, Medco is not itself the real purchaser of dispensing services or prescription drugs from network retail pharmacies. Rather it acts as a

purchasing agent on behalf of the Plan Sponsors that retain it. Medco takes no insurance risk and is not an insurance company. In contrast to an insurance company or HMO, which is paid a premium and bears the healthcare cost risk for the people covered under a health insurance policy or HMO plan, Medco bears virtually no risk relating to the cost of the prescription benefit plan, especially as it relates to the retail pharmacy network. Medco accumulates claims from retail pharmacies, sends them to the Plan Sponsor for payment, and pays the retail pharmacies, but only after the Plan Sponsor has paid Medco for the prescriptions. The Plan Sponsor bears all the material risk relating to the prescription drug benefit plan.

## C. Medco's Anticompetitive Conduct and Abuse of Power

9. Each Plan Sponsor of a prescription drug benefit plan that Medco administers will certainly purchase prescription drugs and dispensing services from the same retail pharmacies where other Plan Sponsors of drug benefit plans administered by Medco also purchase prescription drugs and dispensing services -- and would have done so had they not employed Medco as their agent. In that regard, Plan Sponsors compete in buying prescription drugs and dispensing services. As in any market, the extent to which those competitors actively compete with one another can be expected to affect the price to be paid to pharmacies for prescription drugs and dispensing services. Vigorous competition would have led to higher payments for filling prescriptions as Plan Sponsors vied to provide dispensing convenience for the Plan Members. On the other hand, if they agreed not to bid up the price or keep from bidding against each other, they reduce the apparent demand for filling prescriptions and would thereby reduce the market price for prescription drugs and dispensing services provided by retail pharmacies. Of course, this kind of horizontal agreement would be price-fixing. However, by jointly conferring their pharmacy purchase decisions upon Medco, Plan Sponsors accomplished the same thing.

Each Plan Sponsor was certainly aware that Medco negotiates and deals with network retail pharmacies on behalf of not only itself but also many Plan Sponsors. By using Medco as a common agent, the Plan Sponsors confronted retail pharmacies with coordinated offers and bargaining positions, the terms of which Medco was able to manipulate to force lower prices for prescription drugs and dispensing fees than independent negotiations by each Plan Sponsor separately would have otherwise generated. For that reason, the actions of Medco as a common agent for the Plan Sponsors constitute horizontal restraints of trade between and among direct competitors and, where those actions affect price, constitute horizontal price fixing.

10. Medco and its Plan Sponsors also engage in price-fixing when the Plan Sponsors delegate price-setting authority to Medco. For example, Plan Sponsors have effectively given Medco the function of setting the reimbursement rates for generic drugs, which is called "Maximum Allowable Cost" or "MAC", for the Plans that Medco administers.

11. The tremendous aggregated economic power that Medco can impose has enabled it to set reimbursement rates for retail pharmacies' brand name and generic prescription drugs and dispensing services well below the levels that would prevail in a competitive marketplace. Those rates are so low that, on information and belief, Medco generates the largest part of its net revenue by retaining the "spread" between what the Plan Sponsors pay it for prescription drugs and dispensing services provided by retail pharmacies and what Medco pays to the pharmacies.

12. More than that, however, the delegation of dispensing arrangements to Medco as an agent on behalf of all Plan Sponsors eliminates the competition that might otherwise thrive among Plans in providing better coverage options to their members. Had that competition been able to develop to its full extent, any higher prices paid for dispensing services would have gone hand in hand with enhanced quality and availability of dispensing services. Hence, another

effect of the horizontal power collected and wielded within Medco is that pharmaceutical consumers, especially Plan Members, face fewer dispensing options and reduced service.

13. The pernicious effects of the horizontal combination that rests behind Medco go even further. Medco competes directly with network retail pharmacies through its own mail-order pharmacy operations. The power Medco derives from the combination of its Plan Sponsors also can be used vertically to create artificial advantages for its own dispensing activities, diverting profitable refill and follow-on prescription business from retail pharmacies to its own mail-order pharmacy operations. For example, Medco typically prohibits retail pharmacies from providing more than a 30-day supply of drugs. At the same time, however, Medco's mail order pharmacies routinely dispense a 90-day supply. This discriminatory treatment is exclusionary, anticompetitive and harmful to consumers.

14. The great aggregated economic power wielded by Medco also is evidenced by the onerous terms of the contracts that retail pharmacies must sign in order to participate in a Medco network and the added costs and inefficiencies that Medco imposes on retail pharmacies. For example, Medco charges fees to participating pharmacies each time they submit a claim, check on patient eligibility, or try to determine what drug is on the applicable formulary. At the same time, Medco routinely delays sending reimbursement payments to retail pharmacies, refuses to transfer funds by wire to independent pharmacies and delays updating its price lists to reflect increases in drug prices.

15. Prescription benefit managers have contributed to better management of drug therapy in the past and could continue to do so in the future. In the end, the problem here is not that the concept of prescription benefit management is wrong. Rather, the problem here lies in the fact that Plan Sponsors are working in combination with Medco to aggregate and use their

buying power for their own benefit and to the detriment of retail pharmacies and consumers.

## JURISDICTION AND VENUE

16. Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover damages, including treble damages, costs of lawsuit, and reasonable attorneys' fees against the Defendant for injuries Plaintiffs and members of the Class have sustained as a result of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint.

17. This Court has jurisdiction over the subject matter of this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and under 28 U.S.C. §§ 1331 and 1337(a).

18. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c). Defendant Medco maintains offices, has representatives, may be found, and/or transacts business within this District within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22. Further, a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce discussed below have been carried out in this District.

## THE PARTIES

19. Each of the named pharmacy Plaintiffs and each member of the Plaintiff Class is currently, or was during the Class Period, a retail pharmacy that participated in one or more networks managed by Defendant Medco on behalf of one or more prescription drug benefit plans that Defendant Medco administers.

20. Plaintiff Brady Enterprises, Inc. ("Brady") owns and operates pharmacies located in Chicago, Hickory Hills and Homewood, Illinois

21. Plaintiff Charlotte J. Lopacki d/b/a Budget Drug ("Lopacki") owns and operates a pharmacy located in Feasterville, Pennsylvania.

22. Plaintiff Heritage Pharmacy, Inc. ("Heritage") owns and operates a pharmacy located in Washington Crossing, Pennsylvania.

23. Plaintiffs Brady, Lopacki and Heritage collectively are referred to herein as the "Plaintiffs."

24. Plaintiff Pharmacy Freedom Fund ("PFF") is a not-for-profit organization of several thousand independent community pharmacy owners. Its headquarters is located at 1500 Cienegas Circle, Fort Worth, Texas 76112. PFF seeks injunctive relief on behalf of its members, and does not seek status as a representative plaintiff or Class member under Fed. R. Civ. P. 23.

25. Plaintiff National Community Pharmacists Association ("NCPA") is a not-for-profit association. NCPA represents the nation's community pharmacists including the owners of 24,000 pharmacies. These independently owned pharmacies generate more than $67 billion in annual sales and dispense approximately half of all outpatient prescriptions. Its headquarters is located at 205 Daingerfield Road, Alexandria, Virginia 22314. NCPA seeks injunctive relief on behalf of its members, and does not seek status as a representative plaintiff or Class member under Fed. R. Civ. P. 23.

26. Defendant Medco is a PBM. Its principal executive offices are located at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417. PAID Prescriptions, L.L.C. ("PAID") is a wholly-owned subsidiary of Medco that, *inter alia*, enters into contracts with retail pharmacies in Medco's networks. As used in this Complaint, "Medco" includes Medco, PAID, their predecessors and all subsidiaries and other entities owned or controlled by any of them.

27. Merck & Co., Inc. ("Merck") is the parent of Medco and is one of the largest

pharmaceutical manufacturers in the world. Its principal executive offices are located at One Merck Drive, Whitehouse Station, New Jersey 08889. For the calendar years 2001 and 2002, Merck had total sales of $47.7 billion and $51.8 billion, respectively, of which some $28.7 billion (60%) and $32.6 billion (63%) were generated by Medco.

28. Merck is named as a defendant because it exerts control and influence over the operation of Medco and has used Medco as its alter ego in order to maintain the high profitability of Merck's pharmaceutical business. Merck has used Medco to increase the market share of Merck's drugs, including Zocor, Prinzide and Prinivil, in the Plans administered by Medco. In SEC filings, Medco has admitted that "[i]n the past, the aggregate market share of Merck products under plans we manage or administer has in the aggregate exceeded the national third-party market shares of Merck patented products (excluding prescriptions under plans we manage or administer)." Medco indicates that, for the fourth quarter of 2002, the aggregate market share of Merck products in Medco plans was some 33% higher than it was in other third-party plans. Merck drugs could not have such large market shares at Medco absent the strong influence that Merck exerts over Medco's operations, especially in light of the small amount of the rebates that Merck paid to Medco compared to other drug manufacturers.

29. The extent of Merck's control and influence for the next several years is set forth in the five-year Managed Care Agreement that Merck required Medco to sign as of July 2002, which will survive the spin-off of Medco to Merck's shareholders that is planned for 2003. The Managed Care Agreement, as summarized by Medco (page 116 of Medco Form 10, dated May 28, 2003), requires that Medco comply with the following obligations:

(i) "ensuring that all Merck patented products are included in each of our standardized formularies on the most preferred branded tier;"

(ii) "making offers and proposals to potential, new or existing plans relating to the treatment of Merck patented products under those plans;"

(iii) "using our best efforts to ensure that Merck patented products are made available to members under plans we manage or administer with no less favorable access, and on a no less favorable clinical or economic basis, than competitive patented products;"

(iv) "providing notices and information to Merck and our clients, affording Merck the opportunity to communicate with us and our clients regarding Merck patented products and the recommendations we make to our clients regarding those Merck products; and"

(v) "ensuring that for each quarter the dollar-weighted ratio of (a) the market shares of Merck patented products under plans we manage or administer to (b) the national third-party market shares of Merck patented products (excluding prescriptions under plans we manage or administer) is at or above a minimum level."

If the dollar-weighted differential (set forth in (v) above) is below a target market share differential, the rebates paid by Merck to Medco will decline. If the differential falls below a certain minimum, Medco will not receive any rebates from Merck and must pay Merck 50% of its lost revenues as liquidated damages for the quarter.

30. The terms of the Managed Care Agreement reflect the stranglehold that Merck has previously exerted and will continue to exert over Medco's core business. Merck has precluded Medco from operating its core business independently from Merck, materially impairing Medco's ability to select the most cost-effective drugs and to obtain greater discounts and rebates from Merck and other drug manufacturers. Indeed, that Agreement indicates that Merck has used Medco and will continue to use Medco as another marketing arm for Merck's brand name drug products. As a result, the only way for Medco to generate substantial savings

and increase profits is to extract greater discounts from retail pharmacies and to divert refill and follow-on prescription business from them to Medco's mail order pharmacy operations.

**UNNAMED CO-CONSPIRATORS TO DEFENDANT'S ANTICOMPETITIVE CONDUCT**

31. Various persons and/or firms not named as Defendants herein have participated as co-conspirators in the violations alleged in this complaint, and have performed acts in furtherance of the violations alleged. The acts alleged in this Complaint have been done by Defendant in conjunction with the Plan Sponsors, and were authorized, ordered, and performed by Defendant's officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of its business affairs.

**INTERSTATE COMMERCE**

32. Defendant's activities, including activities related to its concerted actions, illegal contracts, combination, and conspiracy with others to restrain competition in the market for the dispensing and sale of brand name and generic prescription drugs, are in the flow of, and substantially affect, interstate commerce.

33. Among other things, Medco communicates with Plan Sponsors across state lines using interstate telecommunications networks, the Internet, and the United States mail. Medco also obtains billions of dollars in payments from out-of-state sources and purchases billions of dollars of goods and services from out-of-state sources.

**PLAINTIFF CLASS ALLEGATIONS**

34. The Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is defined as follows:

i. All pharmacies that, at any time during the period commencing four years before the filing of the complaint through the present (the "Class Period"), contracted with Medco to dispense and sell brand name and generic prescription drugs for any prescription drug benefit plan(s). Excluded from the Class are Defendant, its parent companies, subsidiaries and affiliates, and government entities.

35. Plaintiffs do not know the exact size of the Class, but Medco claims that it contracts with more than 60,000 pharmacies nationwide. Because Class members are so numerous and are geographically dispersed throughout the United States, joinder of all Class members is impracticable.

36. There are questions of law or fact common to the Class, including but not limited to the following:

(a) Whether amounts paid to Plaintiffs and members of the Class for the dispensing and sale of brand name and generic prescription drugs have been fixed, depressed, standardized and/or stabilized at levels below those that would prevail in a competitive market;

(b) Whether Medco engaged in concerted action and/or a contract, combination, or conspiracy with Plan Sponsors to restrain competition in the market for the dispensing and sale of brand name and generic prescription drugs by arbitrarily setting the amounts that Plaintiffs and members of the Class can charge to Plan Members for dispensing prescription drugs;

(c) Whether Medco, for and on behalf of Plan Sponsors, has fixed the terms and conditions under which Plaintiffs and members of the Class dispense and sell brand name and generic prescription drugs, including limiting the quantity of drugs that Plaintiffs and members of the Class may dispense to Plan Members and/or requiring Plan Members to use Medco's mail order pharmacies for maintenance drugs;

(d) Whether Defendant's conduct causes and has caused a substantial decrease in competition by diverting Plan Members' business from Plaintiffs and members of the Class to Medco's own mail-order pharmacy operations;

(e) Whether Plaintiffs and members of the Class have been injured by Defendant's conduct, and, if so, the appropriate class-wide measure of damages; and

(f) Whether Plaintiffs and members of the Class are entitled to injunctive relief.

37. The Plaintiffs' claims are typical of the claims of all members of the Class. The Plaintiffs' interests are not antagonistic to the interests of other members of the Class, and the Plaintiffs will fairly and adequately protect the interests of members of the Class. Plaintiffs are represented by counsel experienced in the prosecution of antitrust class actions.

38. Defendant has acted, and has refused to act, on grounds generally applicable to the Class, thereby making final injunctive relief appropriate as to the Class.

39. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

40. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily defined and prosecution of a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that in some instances may be too small to warrant the expense of individual complex litigation.

**RELEVANT MARKETS**

41. The relevant geographic market for purposes of Plaintiffs' claim is the United States.

42. The relevant product market consists of the dispensing and sale of brand name and generic prescription drugs.

43. Today, claims for more than 70% of all outpatient prescriptions are processed through PBMs. Defendant Medco is the largest PBM in terms of net revenues and the total amount of drug expenditures. Medco also claims to fill 30% more prescriptions via mail order

than its three largest competitors combined.

44. The effect of the anticompetitive activities in which the Defendant and others in combination, conspiracy and concert with Defendant have engaged in the relevant market is to:

(a) Depress the prices that Plaintiffs and members of the Class have received for the dispensing and sale of brand name and generic prescription drugs significantly below levels that would prevail but for the combination and conspiracy;

(b) Set arbitrarily the maximum and minimum amounts that Plaintiffs and members of the Class can charge Plan Members for dispensing and selling brand name and generic prescription drugs;

(c) Divert business from the Plaintiffs and members of the Class to Medco's mail-order pharmacy; and

(d) Impose unreasonable and unnecessary additional costs on the Plaintiffs and members of the Class.

## MEDCO AS A PRESCRIPTION BENEFIT MANAGER

### A. Background

45. The term "PBM" applies to a variety of firms that assist Plan Sponsors in developing or implementing a prescription drug plan for Plan Members. The basic concept of a PBM is to manage effectively a drug benefit program for a Plan Sponsor, including the purchase of prescription drugs from a network of pharmacies at a cost savings to the Plan Sponsor. PBMs typically develop formularies (lists of preferred drugs) and negotiate rebates from brand-name drug manufacturers for including some of their drugs in the Plan's formulary or increasing the usage of their drug(s). PBMs also contract with pharmacies to provide prescription drugs and related services. Typically, the PBMs handle the adjudication (the determination of the validity and amount of claims) and processing of prescription drug claims electronically.

46. The original model for negotiating reimbursement levels between third-party payers (such as insurance companies) and pharmacies was developed in 1969 by Pharmaceutical

Card Systems, Inc. Pharmaceutical Card Systems, Inc. (which became widely-known as PCS Health Systems ("PCS") is the principal predecessor of Medco's largest competitor, AdvancePCS) established an administrative network under which insurance companies or other third-party payers could reimburse the pharmacies for filling prescriptions of people whose health plan had a drug benefit. Under this system, each individual pharmacy and each individual insurance company determined between themselves one-to-one the amount to be paid for the ingredient dispensed, the amount to be paid as the professional (dispensing) fee, and the amount to be collected from the patient as a deductible or co-pay. Pharmaceutical Card Systems, Inc. did not consult or advise either pharmacies or third-party payers on the establishment of fee levels. The Antitrust Division of the United States Department of Justice advised Pharmaceutical Card Systems, Inc. that the Division would not prosecute it under the antitrust laws as long as it did not consult or advise pharmacists or third-party payers as to the level of payment.

47. In the late 1980s and early 1990s, firms involved in claims processing (such as Pharmaceutical Card Systems, Inc.) became PBMs and began to solicit as clients major employers, insurance companies, and managed healthcare organizations that were interested in means of administering prescription drug benefit plans.

48. During the 1990s, PBMs quickly assumed a central role in administering prescription drug transactions. In 1990, third-party payers (including PBMs) paid for only 27% of all prescriptions filled in pharmacies (60% of prescriptions were paid in cash by the patients themselves and 13% were paid by Medicaid). By 2001, third-party payers (primarily PBMs) were paying for more than 75% of all prescriptions filled by retail pharmacies. Today, over 200 million people are covered by Plans administered by PBMs, according to the PBMs' trade association.

49. More than thirty years after Pharmaceutical Card Systems, Inc. developed its administrative network model, pharmacies still receive a dispensing fee plus an amount to cover the cost of the drug (the "ingredient fee"). But while, thirty years ago, Pharmaceutical Card Systems was not involved at all in setting the amounts of the dispensing fees, ingredient fees or co-pays, today Medco is the major force involved in setting the levels of the dispensing fees and ingredient fees that Medco pays to pharmacies because, as the common agent of the Plan Sponsors, it is able to use the combined bargaining power of all the Plans that Medco administers.

## B. Medco's PBM Operations

50. Measured by net revenues or drug expenditures, Medco is the largest PBM in the United States. Some 63 million people are members of a Plan administered by Medco. Medco processes and pays for approximately 465 million retail pharmacy prescriptions a year, paying in excess of an estimated $25 billion to retail pharmacies. Moreover, Medco's mail order pharmacy operations filled 82 million prescriptions in 2002, which Medco claims is 30% more than the combined total of its three largest competitors (AdvancePCS, Express Scripts and Caremark). Since each prescription filled by its mail-order operations is for a 90-day supply rather than the 30-day supply applicable to retail pharmacies, Medco manages and handles claims processing and payment for the equivalent of 711 million retail prescriptions a year amounting to over $33 billion annually in prescription drug spending.

51. Medco's PBM operation has four primary revenue streams:

(a) Administrative fees from Plan Sponsors;

(b) Rebates from drug manufacturers (on brand-name drugs only);

(c) Retail margin on drugs sold through its mail-order operations; and

(d) Spread pricing (the difference between what Plan Sponsors pay Medco

and what Medco pays pharmacies).

On information and belief, Medco generates more than 60% of the net revenue (total revenue minus the amount paid to network pharmacies) of its PBM activities from its mail-order operations and spread pricing. The growth in net revenue from mail order and spread pricing is expected to continue as Medco pursues its aggressive mail order marketing efforts and as Medco drives reimbursement levels lower to generate a greater "spread." Administrative fees from Plan Sponsors and rebates from drug manufacturers together represent less than 40% of Medco's net revenue and have leveled off or declined in recent years. Medco receives no manufacturer rebates on prescriptions filled with generic drugs.

## C. Medco's Retail Pharmacy Network

52. Because the number of people enrolled in prescription benefit plans expanded from 26% of the U.S. population in 1990 to some 70% today, it has become increasingly important for Plaintiffs and members of the Class to be included in the provider networks established by each of the major PBMs. Exclusion from a network may result in a significant reduction in customers for Plaintiffs and members of the Class.

53. Medco contracts with Plaintiffs and members of the Class through PAID, which is wholly owned by Medco, as well as through other wholly-owned entities. Medco (including PAID and its affiliates) has one or more contracts with virtually all of the roughly 60,000 pharmacies in the United States. Every year or so, Medco modifies the contractual terms unilaterally by sending Plaintiffs and members of the Class amendments or revised pages to the agreement or pharmacy services manual.

54. Supplements to Medco's agreements with retail pharmacies set the amount Medco will pay Plaintiffs and members of the Class as reimbursement for the cost of the drug (usually the average wholesale price ("AWP") minus a designated discount for a brand-name drug and

maximum allowable cost ("MAC") for a generic drug), the amount it will pay as a "dispensing fee" (compensation for the service of filling a prescription; for example, $2.00), and other terms regarding the amount to be paid to Plaintiffs and members of the Class. The retail network pharmacies are also required to charge the Plan Member the co-pay or co-insurance that is indicated by Medco's computer system. The pharmacy is not permitted to charge more or less than the designated amount of the co-pay or co-insurance.

**D. <u>Medco Is the Common Negotiating Agent for Plan Sponsors</u>**

55. As noted above, Medco has structured its PBM operations so that it is not the real purchaser of the pharmacy services and drugs provided by retail pharmacies to Plan Members. The real purchaser is the Plan Sponsor, and Medco assumes no risk. It merely passes on to Plan Sponsors the claims it receives from Plaintiffs and members of the Class (after adding an administrative fee). By the terms of its agreement with Plaintiffs and members of the Class, Plaintiffs and members of the Class have no claim for payment against Medco unless and until Medco is paid by the Plan Sponsor. If the Plan Sponsor fails to pay, Plaintiffs and members of the Class bear the loss. Further, the levels of the discounts from Plaintiffs and members of the Class are locked in by contract (which is self-enforcing since Medco itself pays Plaintiffs and members of the Class) so that Medco has no real risk in meeting minimum savings clauses in contracts with Plan Sponsors.

56. Over the years, Medco has exercised more and more power in negotiating and contracting with Plaintiffs and members of the Class concerning the level of reimbursement they will receive. The one-to-one negotiation between third-party payers and the pharmacies common in the 1970's has been replaced not only by use of a common negotiating agent but also by grouping retail pharmacies into networks. Pharmacies that were to be reimbursed at different

levels were divided into separate "networks," all operating under the same basic pharmacy agreement but with addenda identifying each of Medco's networks they had agreed to participate in and indicating the reimbursement level for each network.

57. With the advent of networks, Medco and its Plan Sponsors enhanced their bargaining power vis-à-vis Plaintiffs and members of the Class. An individual pharmacy or a pharmacy chain might not be willing to offer a significant discount to a Plan Sponsor that had relatively few Plan Members in the market area of the store or chain. But by grouping the Plans into networks and then presenting the network's purchasing power as a single unified block, Plaintiffs and members of the Class are confronted with a "united front." If they want to get the business of members of any Plans in a Medco network, Plaintiffs and members of the Class have to take all the Plans in the network.

58. While Medco is not the real purchaser of prescription drugs and dispensing services from retail pharmacies, it clearly is the common agent representing all its Plan Sponsors vis-à-vis individual retail pharmacies. Each Plan Sponsor is fully aware that Medco negotiates and deals with network retail pharmacies on behalf of not only itself but also many Plan Sponsors. Indeed, in marketing to Plan Sponsors, Medco emphasizes the number and size of the Plan Sponsors it represents and the number of people covered. Medco uses the combined economic power of its Plan Sponsors to impose a one-sided contract and ever-decreasing reimbursement rates on retail pharmacies. Inasmuch as that activity derives from the combination of Plan Sponsors, who are otherwise direct competitors for those same prescription drugs and dispensing services, its legal and economic effect is the same as if the Plan Sponsors had agreed on the contracts and reimbursement rates among themselves. That, of course, would be a per se violation of the antirust laws. So too then is this.

59. Medco uses the combined economic power of its Plan Sponsors to drive reimbursement levels below a competitive level on their behalf and, at the same time, create more income for itself. Until the mid-1990's, the amount paid by a Plan Sponsor for a prescription was generally the same (except for the administrative fee that the Plan Sponsor paid Medco) as the amount that Medco paid the retail pharmacy for that same prescription. As Medco has driven reimbursement levels lower and lower, it has also created a "spread" between what the Plan Sponsor pays for a prescription and what Medco pays the pharmacy for the same prescription.

60. Plan Sponsors have also effectively delegated price-setting authority to Medco with regard to reimbursement for the cost of generic drugs. Acting with this power in hand, Medco sets and changes the MAC price lists that are used to set reimbursement amounts for generic drugs for the Plans it administers. Medco has used its control of its MAC price lists continually to reduce reimbursement levels to Plaintiffs and members of the Class, thereby further "ratcheting down" the amounts paid to Plaintiffs and members of the Class. As a result, generic drugs have a far greater spread (on a percentage basis) between what the Plan Sponsor pays and the retail pharmacy receives than brand name drugs.

61. Medco has compounded the impact on retail pharmacies of the reduced reimbursement levels by increasing their operating costs and delaying payment to them in order to generate even more income for Medco. These actions by Medco include:

(a) Requiring pharmacists to pay fees each time they want to obtain basic information (e.g., what drugs are on a formulary) or process a claim;

(b) Routinely denying or underpaying claims with little or no explanation;

(c) Requiring Plan Sponsors to wire money to Medco (usually within 48 hours) but withholding payment to retail pharmacies for weeks; and

(d) Failing to increase reimbursement rates promptly after drug price increases.

## E. Medco Has Used the Combined Power of Its Plan Sponsors to Divert Business to Its Mail Order Pharmacy and Limit Competition Among Plan Sponsors

62. The combined power of its Plan Sponsors also gives Medco the ability to impose anticompetitive restrictions on the activities of retail pharmacies that active competition among Plan Sponsors would not otherwise support. These restrictions include: (i) the arbitrary limitations placed on network retail pharmacies (and all other mail order pharmacies as well) in order to divert refill business to Medco's mail order operations, and (ii) the prohibition against charging any Plan Member more or less than the mandated co-pay. Without these anticompetitive restrictions in a competitive market, Plan Sponsors might well compete to provide a wider range of pharmaceutical coverage options to their Plan Members including offering a greater variety of pharmacy services from a wider array of pharmacies. Hence, another effect of the horizontal collusion embodied in Medco's role as the common agent of its Plan Sponsors is that consumers have fewer dispensing options and service alternatives and less freedom of choice.

63. The effect of this collusion on consumer choice is especially evident with regard to Medco's mail order operations. Virtually all the Plans administered by Medco prohibit Plaintiffs and members of the Class from providing more than a 30-day supply of a drug, and Medco will not reimburse a pharmacy, including another mail order pharmacy, for more than a 30-day supply absent special circumstances. In contrast, Medco's mail-order operations routinely dispense a 90-day supply of prescription drugs to Plan Members. In fact, Medco prohibits any pharmacy from filling prescriptions by mail or any other third-party delivery means on a routine basis even though all pharmacies are licensed to do so and retail pharmacies have been filling

prescriptions by mail for over a century. Some Plans administered by Medco refuse to reimburse Plaintiffs and members of the Class for any maintenance drugs dispensed other than the initial prescription.

64. Medco aggressively pursues prescription drug refill and follow-on business that otherwise would be provided by the Plaintiffs and members of the Class. Using Plan Members' medical information that it receives from the retail pharmacy that filled the Plan Member's initial prescription, Medco contacts the Plan Member to encourage the Member to use Medco's mail-order operations for any refill and follow-on prescriptions rather than returning to the pharmacy to have them filled. A typical "sales pitch" Medco offers to Plan Members is that they will pay only one co-pay (for example, $15) for a 90-day supply if the refill is filled by Medco's mail-order operation compared to the three co-pays (at $10 each for a total of $30, for example) that the Plan Member would pay at a pharmacy, which, under its agreement with Medco, can only provide a 30-day supply.

65. Loss of refill and follow-on prescription business (which together represent the majority of all drugs dispensed) to mail order deprives Plaintiffs and members of the Class of the most profitable part of their pharmacy business. Handling refill and follow-on prescriptions is considerably less expensive than handling the initial prescription because filling the initial prescription involves, by far, the most data entry into the applicable computer systems (including the PBM's), the most interaction with the patient (to determine patient eligibility and to inform the patient when and how to take the medication), and is much more likely to encounter problems that need to be resolved with the PBM (or other third-party payer), the doctor and/or the patient, such as patient eligibility, formulary compliance, drug interaction and change of medication or dosage.

66. Consumer choice is also limited by the requirement that retail pharmacies charge no more and no less than the co-pay indicated by Medco's computer system. An obvious alternative that would promote competition would be for a Plan Sponsor to designate how much it will pay for filling a given prescription. If the pharmacy is willing to accept a lower co-pay or the Plan Member is willing to pay more because she feels she is getting better or enhanced service, the Plan Member has a greater array of options available at no additional cost to the Plan Sponsor. But, this again might prompt Medco's Plan Sponsors (including some of the largest insurance companies, Blue Cross Blue Shield companies, HMOs and managed care companies in the United States, not to mention large employers) to compete with each other to provide more and better dispensing alternatives to Plan Members. It is evident, however, that part of Medco's role as common agent for its Plan Sponsors is to limit the competition between and among them, thereby increasing the benefits that they derive from the exercise of their aggregated power. Such lessening of competition, however, damages retail pharmacies and acts to the detriment of the almost 65 million Americans covered under prescription benefit plans administered by Medco.

## DEFENDANT'S ANTICOMPETIVE CONDUCT

67. By acting as the common agent of Plans and Plan Sponsors and using their combined bargaining power, Medco has engaged in anticompetitive conduct to:

(a) Set artificially low reimbursement levels for Plaintiffs and members of the Class;

(b) Pay less to Plaintiffs and members of the Class than Medco charges to Plan Sponsors for the cost of dispensing and providing brand name and generic prescription drugs to Plan Members;

(c) Set and change prices to be paid to Plaintiffs and members of the Class for generic drugs, on behalf of Plan Sponsors, as Medco chooses;

(d) Artificially limit the ability of Plaintiffs and members of the Class to compete with Medco's mail-order pharmacies;

(e) Prohibit Plaintiffs and members of the Class from filling prescriptions for more than 30 days' supply;

(f) Charge an effectively greater co-pay for using a Plaintiff or member of the Class rather than Medco's mail-order pharmacy, even in situations where there is no increased cost to the Plan Sponsor and/or the Plan Member is willing to pay an additional amount to use the retail pharmacy;

(g) Use patient information provided to Medco in its capacity as an agent of the Plan Sponsor to contact the patient for the purpose of marketing Medco's mail-order pharmacy service;

(h) Prohibit Plaintiffs and members of the Class from filling prescriptions, except in exceptional circumstances, through the mail, overnight delivery services, or other means of communications and delivery;

(i) Prohibit Plaintiffs and members of the Class from charging an additional amount to informed, consenting patients who are willing to pay more for a particular pharmacy's enhanced or better service;

(j) Require Plaintiffs and members of the Class to sign one-sided contracts and impose contract changes on Plaintiffs and members of the Class unilaterally;

(k) Impose additional costs and inefficiencies on Plaintiffs and members of the Class; and

(l) Limit competition between and among Plan Sponsors.

**COUNT I**
**VIOLATION OF SECTION 1**
**OF THE SHERMAN ACT, 15 U.S.C. § 1**

68. Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

69. Defendant has contracted, combined, and conspired and acted in concert with other co-conspirators unreasonably to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70. The contract, combination, and conspiracy alleged herein consists of a continuing agreement, understanding, and concert of action among Defendant and other unnamed co-conspirators to restrain competition in the market for the dispensing and sale of brand name and generic prescription drugs.

71. Defendant, acting in concert with others, namely its Plan Sponsors, illegally restrains competition in a number of related ways, including:

(a) Setting reimbursement levels for Plaintiffs and members of the Class substantially below the levels that would exist in a competitive market;

(b) Imposing anticompetitive terms and conditions on Plaintiffs and members of the Class, such as the 30-day supply dispensing limit, that do not allow them to compete on an equal footing with Medco's mail-order services for the dispensing and sale of prescription drugs;

(c) Improperly diverting business from Plaintiffs and members of the Class by allowing Medco to use patient information to market Medco's mail-order services for the dispensing and sale of prescription drugs to Plan Members;

(d) Prohibiting Plaintiffs and members of the Class from: (i) charging lower co-pays to Plan Members (such as to compete with Medco's mail-order pharmacy operations) or (ii) charging more if the Plan Member is willing to pay more to use the particular pharmacy (which does not increase the cost to the Plan Sponsor); and

(e) Imposing onerous contracts and higher costs on Plaintiffs and members of the Class (with which Medco competes), creating inefficiencies and delaying or denying payment without justification.

72. The illegal restraints and actions alleged herein have the purpose and effect of artificially fixing, depressing, standardizing, and stabilizing the amount that Plaintiffs and members of the Class are paid for the dispensing and sale of brand name and generic prescription drugs below what they would be paid absent such illegal restraints and actions. As such, they constitute *per se* illegal price fixing in the market for the dispensing and sale of brand name and generic prescription drugs, or otherwise violate Section 1 of the Sherman Act as an unreasonable

restraint of trade in the market for the dispensing and sale of brand name and generic prescription drugs.

73. The illegal restraints and actions alleged herein also have the purpose and effect of artificially setting the prices that Plaintiffs and members of the Class can charge to Plan Members for the dispensing and sale of brand name and generic prescription drugs. As such, they constitute *per se* illegal price fixing in the market for the dispensing and sale of brand name and generic prescription drugs, or otherwise violate Section 1 of the Sherman Act as an unreasonable restraint of trade in the market for the dispensing and sale of brand name and generic prescription drugs.

74. The illegal restraints and actions alleged herein also have the purpose and effect of imposing unconscionable contracts, unnecessary costs, operating inefficiencies, and payment delays and denials on Plaintiffs and members of the Class. As such, they constitute *per se* illegal agreements and actions to raise competitors' costs in the market for the dispensing and sale of brand name and generic prescription drugs, or otherwise violate Section 1 of the Sherman Act as an unreasonable restraint of trade in the market for the dispensing and sale of brand name and generic prescription drugs.

75. The illegal restraints alleged herein also have the purpose and effect of injuring Plaintiffs and members of the Class by diverting Plan Members from the pharmacies operated by Plaintiffs and members of the Class to the mail-order pharmacy owned and operated by Medco. As such, they constitute *per se* illegal concerted actions to unreasonably injure them, divert their business to mail order and refuse to deal with them for refill and follow-on prescriptions or otherwise violate Section 1 of the Sherman Act as an unreasonable restraint of trade in the market for the dispensing and sale of brand name and generic prescription drugs.

76. Medco has participated in one or more overt acts in furtherance of the contract, combination and conspiracy alleged herein, and has participated in the concerted and conspiratorial activities described.

77. During the Class Period, Plaintiffs and members of the Class were injured by the illegal restraints alleged herein. Among other things, Plaintiffs and members of the Class were compensated substantially less for their services and for their brand name and generic prescription drugs than they would have been in the absence of the illegal restraints, have suffered loss of a significant portion of their customers' refill and follow-on business, and have incurred unnecessary costs, inefficiencies, and delays, and denials of payment. Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property as a result of the illegal restraints.

## DAMAGES

78. As a result of Defendant's violations of the antitrust laws during the period from four years before the filing of this Complaint to the present, Plaintiffs and members of the Class have been damaged in their business and property in amounts to be determined.

WHEREFORE, Plaintiffs and members of the Class pray for judgment against Defendants and members of the Defendant Class, as follows:

A. Certifying this action as a plaintiff class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives and designating their counsel as Plaintiff Class Counsel;

B. Entering judgment against Defendant in favor of Plaintiffs and the members of the Class and awarding Plaintiffs and members of the Class three times actual damages against Defendant for its violations of Section 1 of the Sherman Act;

C. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining all aspects of Defendant's continuing violations of Section 1 of the Sherman Act;

D. Granting Plaintiffs and members of the Class the costs of prosecuting this action, together with pre- and post-judgment interest and reasonable attorneys' fees and costs; and

E. Granting such other relief as this Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Dated: ______________________________

Respectfully submitted,

Plaintiffs Brady Enterprises, Inc., Charlotte J. Lopacki d/b/a Budget Drug, Heritage Pharmacy, Inc., Pharmacy Freedom Fund, and National Community Pharmacists Association

By: ______________________________
One of their Counsel

Michael J. Freed
Much Shelist Freed Denenberg Ament & Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606-1615
Phone: 312-521-2000
Fax: 312-521-2200

H. Laddie Montague
Jerome Marcus
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103-6365
Phone: 215-875-3000
Fax: 215-875-4671

Robert N. Kaplan
Gregory K. Arenson
Kaplan Fox & Kilsheimer LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Phone: 212-687-1980
Fax: 212-687-7714

William H. Wentz
Fewkes Wentz & Strayer
1770 North Park Street
Suite 202
Naperville, IL 60563
Phone: 630-527-8552
Fax: 630-527-8636

Joel C. Meredith
Meredith Cohen Greenfogel & Skirnick, P.C.
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Phone: 215-564-5182
Fax: 215-569-0958

Sherman Marek
Law Offices of Sherman Marek, P.C.
1100 North Dearborn Street, # 1812
Chicago, IL 60610
Phone: 312-440-9192
Fax: 312-873-3866

Howard Langer
Golomb Honik & Langer P.C.
121 South Broad Street, 9th Floor
The North American Building
Philadelphia, PA 19107
Phone: 215- 985-1109
Fax: 215-985-4169

Paul Weiss
Freed & Weiss LLC
111 West Washington Street, Suite 1331
Chicago, IL 60602
Phone: 312-220-0000
Fax: 312-220-7777

Lynn Lincoln Sarko
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3029
Phone: 623-206-1900
Fax: 623-206-3384

Joseph Goldberg
Freedman, Boyd, Daniels, Hollander, Goldberg
& Cline P.A.
20 First Plaza
Suite 700
Albuquerque, NM 87102
Phone: 505-842-9960
Fax: 505-842-0761

Deborah H. Bornstein
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
Phone: 312-443-3200
Fax: 312-443-1323

Ann D. White
Mager, White & Goldstein, P.C.
261 Old York Road, Suite 810
Jenkintown, PA 19046
Phone: 215-481-0273
Fax: 215-481-0271

Paul Slater
Sperling & Slater
55 West Monroe Street
Chicago, IL 60603
(312) 641-3200